**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Supreme Court**

Friends of Gadsden Creek, Appellant,

v.

South Carolina Department of Health and Environmental Control and WestEdge Foundation, Inc, Respondents.

Appellate Case No. 2023-000006

---

Appeal From Charleston County
Ralph King Anderson, III, Administrative Law Judge

---

Memorandum Opinion No. 2024-MO-022
Heard June 19, 2024 – Filed October 9, 2024

---

**AFFIRMED**

---

Benjamin David Cunningham and Lauren Megill Milton, both of S.C. Environmental Law Project, of Pawleys Island, for Appellant.

Mary Duncan Shahid, of Nexsen Pruet, LLC, of Charleston; Kirsten Elena Small, of Maynard Nexsen, PC, of Greenville; and Michael Smoak Traynham, of Maynard Nexsen, of Columbia, for Respondent WestEdge Foundation, Inc. Sara Volk Martinez and Bennett W. Smith, both of South Carolina Department of Environmental Services, of Columbia; and Bradley

David Churdar, of Charleston, for Respondent South
Carolina Department of Health and Environmental
Control.

———————

**PER CURIAM:**  The South Carolina Department of Health and Environmental
Control (DHEC) granted a permit for the WestEdge Foundation (WestEdge) to fill
in and build a mixed-use development on top of 3.9 acres of saltmarsh and creek
located on the west side of the City of Charleston.  After a five-day contested case
hearing, the administrative law court (ALC) affirmed DHEC's grant of the permit,
finding that, while the saltmarsh and creek are critical tidal lands, they partially exist
over a landfill.  The ALC concluded that tidal and stormwater flooding often
inundates the surrounding streets and neighborhoods with polluted water, and thus,
DHEC acted within its discretion in granting the permit.  We affirm.

## I.

"Under the public trust doctrine, the State holds presumptive title to tidal land below
the high water mark to be held in trust for the benefit of all people of South Carolina."
*Estate of Tenney v. S.C. Dep't of Health & Envtl. Control*, 393 S.C. 100, 106, 712
S.E.2d 395, 398 (2011).  All citizens may use and enjoy tidelands, and no citizen has
an inherent right to alter these lands.  *Kiawah Dev. Partners, II v. S.C. Dep't of
Health & Env't Control*, 411 S.C. 16, 29, 766 S.E.2d 707, 715 (2014).  Accordingly,
the public's interest is "the lodestar" which guides any legal analysis evaluating a
proposal to alter tidelands.  *Id.*; *see also S.C. Coastal Conservation League v. S.C.
Dep't of Health & Env't Control*, 434 S.C. 1, 10, 862 S.E.2d 72, 77 (2021).

"Recognizing that permitting alteration of the tidelands may be in the public's
interest in limited circumstances, the State enacted statutes and promulgated
regulations which generally prohibit alterations to the tidelands except when the
public interest requires otherwise." *Kiawah Dev. Partners, II*, 411 S.C. at 29, 766
S.E.2d at 715.  These statutes and regulations include the Coastal Zone Management
Act (CMA); Chapter 30 of the South Carolina Code of Regulations; and the Coastal
Zone Management Program (CMP) administered by DHEC.  *Id.*  "As used within
[Chapter 30 of the South Carolina Code of Regulations], public interest refers to the
beneficial and adverse impacts and effects of a project upon members of the general
public, especially residents of South Carolina who are not the owners and/or
developers of the project."  S.C. Code Ann. Regs. 30-1(D)(45) (Supp. 2023).  "To
the extent that, in the opinion of [DHEC], the value of such public benefits is greater

than the public costs embodied in adverse environmental, economic and fiscal effects, a proposed project may be credited with net public benefits." *Id*.

Gadsden Creek and its accompanying saltmarsh are the channelized remnant of a much larger tidal creek. Before the 1950s, Gadsden Creek naturally flowed through 100 acres of saltmarsh that began at the bank of the Ashley River and ended upland at the Gadsden Green community. The winding creek and its marsh were an important part of the community's economic and recreational life, with members of the Gadsden Green community using the marsh to fish and crab. However, during the 1950s, the City of Charleston decided to turn the saltmarsh into buildable land using trash as fill. From the mid-1950s to l969, the City used the saltmarsh as a landfill. At the time the marsh was being filled, there was no Clean Water Act and many of the current engineering practices necessary to contain landfill contaminants had yet to be in use. For example, today it is common (and required) to line the bottom of a landfill with impacted clay and then collect any water that runs through the trash into a drain for sanitization. This unique type of landfill pollutant (the dirty water that runs through trash) is called leachate. It is undisputed the landfill the City placed over the 100-acre saltmarsh was not properly lined.

While the landfill was active, however, the City constructed a ditch lined with riprap around the south and west perimeter of the landfill to direct stormwater runoff into the Ashley River. In the early 1970s, the City capped the landfill with soil, leaving the lined ditch as a stormwater catchment. The Army Corps of Engineers issued an "after the fact" Rivers and Harbors Act permit for the landfill, which required the City to maintain the soil cap and stormwater catchment. Later in the 1970s, the City rerouted the stormwater catchment from the perimeter of the landfill to run through the landfill. It was rerouted again through the landfill in the 1980s. In the 1990s, the City expanded the culvert at Lockwood Avenue to allow more storm water to drain into the Ashley River, which in turn allowed more tidal water into the creek.

Over time, most of the capped landfill was developed, becoming the current WestEdge Project neighborhood. However, also over time, nature reclaimed the stormwater ditch, turning it into a creek—as tidal waters washed away the channelized liner and formed a marsh at Hagood Avenue where the creek turns. The creek, which never lost the name Gadsden Creek (even when it was a lined ditch), is now 3.9 acres of functioning saltmarsh ecosystem—frequented by wildlife, including herons, crabs, trout, sheepshead, and racoons.

The creek is also polluted. Because tidal waters have eroded both the liner of the channelized creek and the landfill cap, leachate collects in puddles at low tide.

Though diluted at hightide, the leachate is distributed into the Ashley River with the outgoing tide and into the surrounding area when exceptionally high tides cause the creek to overflow onto the streets, even up to Gadsden Creek residences.

WestEdge, a collaboration of the Medical University of South Carolina (MUSC) Foundation and the City of Charleston, applied to DHEC for a permit to partially dredge the landfill under Gadsden Creek to install stormwater pipes, as well as to cap Gadsden Creek to eliminate flooding and create buildable land for mixed-use development. The project proposal included the retention of a portion of Gadsden Creek as a nature-viewing water feature, but this remnant would not be tidally influenced. Because the application required elimination of 3.9 acres of tidally-influenced wetlands, WestEdge included a mitigation plan, consisting of WestEdge's purchase and restoration of 20 acres of tidelands at Kings Grant, a former golf course located fourteen miles upstream from WestEdge and constructed "within tidally influenced wetlands abutting the Ashley River."

In reviewing the application, DHEC requested more information from WestEdge about alternative on-site design proposals that would not require the elimination of Gadsden Creek. In response, WestEdge gathered samples of leachate during low tide and had them analyzed for contaminants. It was discovered the leachate contained high levels of mercury, lead, and other toxins. WestEdge maintained it would not be feasible to keep or restore Gadsden Creek because, even if were technologically possible to mitigate flooding, the problem of the leachate contaminated water could not be solved without re-capping the landfill—i.e. filling in the creek. In support of this position, WestEdge explained that, during an earlier Charleston infrastructure project—the Spring-Fishburne Drainage Project—the City had suggested restoring tidelands within the WestEdge Project neighborhood as its mitigation plan. Ultimately, the Army Corps of Engineers greenlit the Spring-Fishburne Drainage Project but rejected the mitigation plan, stating that as a special condition of its final permit:

> That permittee understands and agrees that excavation of uplands to create a tidal marsh adjacent to Brittlebank Park is not authorized. The potential negative impacts associated with excavating a portion of a former landfill and restoring tidal flow to this area far outweighs the potential environmental benefits of the proposed mitigation activities.

WestEdge asserted based on this previous rejection of a proposal to restore tidelands in the WestEdge Project neighborhood, restoration of Gadsden Creek was not feasible. DHEC was satisfied with this response and granted WestEdge's permit application. Friends of Gadsden Creek requested a final review conference of the permit, which was denied, and then a contested case hearing with the ALC, which was granted. After hearing testimony regarding the history of Gadsden Creek, testimony from community members who support keeping the creek, and testimony from competing experts about the feasibility of restoring the creek, the ALC affirmed DHEC's grant of WestEdge's permit, concluding:

> This was a challenging case, and the Court does not lightly approve of the elimination of critical area tidelands that are so integral to the health, welfare, and vibrancy of our natural ecosystem here in South Carolina. However, this case presents a unique hurdle of a naturalized drainage ditch for a landfill that is now being contaminated by that landfill. Based upon the above, I conclude [Friends of Gadsden Creek] failed to show by a preponderance of the evidence that the Department erred in granting WestEdge the Permit.

Friends of Gadsden Creek appealed the ALC's order, and the parties filed a joint motion to certify the appeal to this Court. This Court granted the motion to certify.

## II.

"[T]he standard of proof in a contested case is by a preponderance of the evidence." S.C. Code Ann. § 1-23-600(A)(5) (Supp. 2023). "The party asserting the affirmative issue in an adjudicatory administrative proceeding has the burden . . . to prove convincingly that the agency's decision is unsupported by the evidence. *Sierra Club v. S.C. Dep't of Health & Env't Control*, 426 S.C. 236, 257, 826 S.E.2d 595, 607 (2019) (quoting *Waters v. S.C. Land Res. Conservation Comm'n*, 321 S.C. 219, 226, 467 S.E.2d 913, 917 (1996)). However, this does not relieve the permit applicant from its overarching burden to satisfy the requirements necessary for approval of its permit application. *Id*. at 258–59, 826 S.E.2d at 607.

In an appeal from an ALC decision, this Court confines its analysis of an ALC decision to whether it is affected by an error of law or is "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." S.C. Code Ann. § 1-23-610(B) (Supp. 2023). "In determining whether the ALC's decision was

supported by substantial evidence, the Court need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion as the ALC." *Kiawah Dev. Partners, II*, 411 S.C. at 28, 766 S.E.2d at 715.

This case demonstrates that previous generations' lack of awareness regarding the effects of using trash to create buildable land—coupled with nature's resilience and the reality that Charleston is experiencing more tidal flooding than ever before—has created a multifaceted problem on the west side of the Charleston peninsula.

We are greatly disturbed and disheartened by the loss of Gadsden Creek in its natural form during the 1950s and 60s. This was injustice for the community that loved the marsh and for all of South Carolina. We are also aware that, although not pristine, the current Gadsden Creek and its accompanying saltmarsh is a functioning tidal eco-system. However, we hold the evidence submitted at the contested case hearing substantially supports the ALC's conclusion that DHEC properly granted WestEdge's permit application. *See Murphy v. S.C. Dep't of Health & Env't Control*, 396 S.C. 633, 645, 723 S.E.2d 191, 198 (2012) (holding "even assuming the [permit applicant] bore a burden . . . substantial evidence supports the conclusion that this burden was overcome"). We acknowledge the well-presented case by Friends of Gadsden Creek. However, after painstakingly reviewing the evidence, we find the issues of stormwater runoff, a polluted urban creek, and tidal flooding have combined to create an extremely rare circumstance where it is in the public's interest to approve the permit to fill in Gadsden Creek. The facts of this case are without precedent, and our decision shall not be used or interpreted as precedent for any other context or permitting situation.

Accordingly, the ALC's decision to uphold DHEC's grant of WestEdge's permit application is

**AFFIRMED.**

**KITTREDGE, C.J., FEW, JAMES, HILL and VERDIN, JJ., concur.**